FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: Apr 21 2025

KEVIN P. WEIMER, Clerk

By: Nicole Lawson Jenkins
    Deputy Clerk

# United States District Court

NORTHERN DISTRICT OF GEORGIA

UNITED STATES OF AMERICA

v.

Sandra Bejarano Garcia

**CRIMINAL COMPLAINT**
Case Number: 1:25-MJ-0405

Under Seal

I, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief.  On or about February 7, 2025 in Clayton County, in the Northern District of Georgia, defendant did knowingly aid and abet others, known and unknown, to possess with the intent to distribute a controlled substance, that is, at least 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, at least five kilograms or more of a mixture or substance containing a detectable amount of cocaine, and at least one kilogram of marihuana

in violation of Title Title 21, United States Code, Sections 841(a)(b)(1)(A) and 841(a)(b)(1)(C) .

I further state that I am a DEA Task Force Officer and that this complaint is based on the following facts:

PLEASE SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof.   Yes

Gavin D Jenkins
Signature of Complainant
Gavin Jenkins

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it. Sworn to me by telephone pursuant to Federal Rule of Criminal Procedure 4.1.

April 21, 2025   at 4:13 PM                    at   Atlanta, Georgia
Date                                                City and State

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer              Signature of Judicial Officer
AUSA Austin M. Hall
Austin.Hall@usdoj.gov

I Gavin Jenkins, Task Force Officer with the Drug Enforcement Administration ("DEA"), being duly sworn, state as follows:

1. I submit this affidavit in support of an application for a criminal complaint of Sandra BEJARANO GARCIA ("BEJARANO GARCIA") as there is probable cause to believe that on or about February 7, 2025, in the Northern District of Georgia and elsewhere, BEJARANO GARCIA knowingly aided and abetted others, known and unknown, to possess with the intent to distribute a controlled substance, that is, at least 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(b)(1)(A), at least five kilograms or more of a mixture or substance containing a detectable amount of cocaine, in violation of Title 21, United States Code 841(a)(b)(1)(A), and at least one kilogram of marihuana, in violation of Title 21 United States Code 841(a)(b)(1)(C).

## AFFIANT BACKGROUND

2. I am an "investigative or law enforcement officer" of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

3. I joined the DEA as a Task Force Officer in May of 2019, and I am currently assigned to the DEA/Organized Crime Drug Enforcement Task Force (OCDETF) - Strike Force Group 2 in Atlanta, Georgia. I have been a law enforcement officer for 19 years and during my career I have conducted numerous investigations of

narcotics and money laundering offenses.  I have participated in investigations of narcotics trafficking, money laundering, complex conspiracies, and among other things, have conducted or participated in surveillances, the execution of search warrants, and debriefings of informants.  Based on my training and experience, I am familiar with the ways in which drug dealers and money launderers conduct their business, including the various means and methods by which they conceal and launder drug proceeds.

4. Based upon training and experience, I am familiar with the ways in which drug traffickers and money launderers conduct their illegal business, including the various means and methods by which drug trafficker's import and distribute drugs; use multiple cellular telephones to facilitate drug trafficking and money laundering activity; and use numerical codes and coded language to conduct their transactions in a manner that they intend will conceal their illegal activity from detection by law enforcement. In my experience, drug traffickers often obtain cellular telephones in fictitious names and/or the names of third parties in an effort to conceal their drug trafficking activities from law enforcement.  I also am familiar with the ways in which drug traffickers conceal, convert, transmit, and transport their drug proceeds, including, without limitation, the use of couriers to transport currency and proceeds, the use of third parties and nominees to purchase or to hold title to assets, the use of multiple vehicles as conveyances for drugs and drug proceeds, the installation of false/hidden compartments ("traps") in those vehicles to covertly transport drugs and drug proceeds, the use of electronic wires, and the use of off-shore accounts to launder and conceal assets.

## SOURCES OF INFORMATION

5.   The information contained in this affidavit is based on my participation in this investigation and statements made by witnesses, information given to me by other law enforcement officers, the results of physical and video surveillance, law enforcement reports, and my review of records seized pursuant to a search warrant and information provided to me by non-law enforcement personnel.

6.   Unless otherwise noted, where in this affidavit I assert that a statement was made, the information was provided by others with whom I have spoken or whose report I have reviewed.  Such statements are not reported in their entirety or verbatim, unless otherwise indicated.

7.   Because this affidavit is being submitted for the limited purpose of seeking the requested warrant, I have not set forth every fact learned during the course of the investigation, nor is this affidavit intended to be a complete and detailed description of all events and conversations occurring during the course of the investigation.  Facts not set forth herein are not being relied upon in reaching my conclusion that a warrant should be issued, nor do I request that the Court rely upon any facts not set forth herein in reviewing this affidavit.

## PROBABLE CAUSE

### A.  *Agents Seize More than $200,000 in Drug Proceeds from BEJARANO GARCIA's Home on April 1, 2025.*

7.     On April 1, 2025, agents with the Drug Enforcement Administration, Bureau of Alcohol, Tobacco, Firearms and Explosives, and Department of Homeland Security, executed a search warrant at 7 Summit Lane, Riverdale, Georgia, 30296, located in Clayton County, in the Northern District of Georgia.  Inside of that residence, agents located Sandra BEJARANO GARCIA.

8.     Upon the execution of the search warrant, BEJARANO GARCIA refused to exit the residence.  The Clayton County SWAT Team deployed a robot with a camera and observed BEJARANO GARCIA running from room to room in what appeared to be an attempt to either destroy or hide evidence.  The SWAT team then broke out the windows of the residence, at which point BEJARANO GARCIA exited the residence empty-handed.

9.     At the time the search warrant was executed, BEJARANO GARCIA lived at the residence with her two adult sons, thirteen-year-old daughter, elderly mother, and her boyfriend, Lucio Hernandez Mora, all of whom were present when the warrant was executed.

10.    During a search of the residence, agents located $217,810 in bulk United States currency (USC) that was concealed throughout the residence.  Agents found $200,810 in USC that was vacuumed sealed and hidden inside a pillowcase that was placed on a bed underneath other pillows.  A Sandy Springs Police certified drug

4

detection canine indicated to the presence of a controlled substance on the $200,810 in USC that was seized from the pillowcase. Based on my training and experience, I believe the seized currency was proceeds from drug trafficking activity. My belief is based on the manner in which the currency was packaged, the quantity of funds, the manner in which it was hidden, and that it was hidden in a personal residence.

11. The pillowcase that contained the $200,810 in USC was under other pillows and placed on the bed in a room that appeared to have been used by BEJARANO GARCIA's mother. In my experience, narcotics traffickers frequently hide contraband in or among the items of children or elderly members of the household because they believe law enforcement officers are less likely to search these areas.

12. Agents located two firearms during a search of the residence: a Taurus, Model 65 revolver, .357 caliber, and a Taurus, Model PT 140 PRO Millenium pistol, .40 caliber. Both firearms were reported to law enforcement as stolen.

13. Agents also located multiple cellular telephones that were deliberately hidden throughout the residence. Agents located a purple iPhone concealed in a large container of rice in the kitchen area. The iPhone was fully changed and was pushed all the way to the bottom of the container. Additionally, agents located three Samsung cellular phones that were well-concealed inside the HVAC vent below the bathroom floor of the bathroom attached to BEJARANO GARCIA's bedroom. Lucio Hernandez Mora identified the bedroom that he and BEJARANO GARCIA used.

14. Agents showed the four cellular devices to BEJARANO GARCIA, and she stated that all four phones belonged to her. BEJARANO GARCIA provided agents the

5

passcodes to open three of the four phones. The fourth phone did not require a passcode to access the device. In my experience, narcotics traffickers use multiple telephones to try to avoid detection by law enforcement and hinder any investigation of their activities.

15. When BEJARANO GARCIA was taken into custody, agents observed several tattoos on her body that were depictions of Nuestra Señora de la Santa Muerte (Santa Muerte). Santa Muerte is an icon in the drug trafficking world. Criminals involved in narcotics trafficking are known to venerate her and seek her protection from violence and capture while they conduct their activities. Agents also discovered a shrine to Santa Muerte in the residence. The shrine contained several figurines depicting Santa Muerte, some which were decorated with U.S. currency, as seen below:



**B.     *February 7, 2025: BEJARANO GARCIA Coordinated the Distribution of More than 50 KGs of Methamphetamine, 5 KGs of Cocaine and 15 KGs of Marihuana.***

16.     On April 7, 2025, agents applied for and were granted a federal search warrant for BEJARANO GARCIA's four cellular devices. A search of BEJARANO

7

GARCIA's phones revealed that she had coordinated with an unknown individual (identified as a contact in three of her phones as "Linda") to distribute drugs to Tory Hardesty almost two months earlier on February 7, 2025.

17. Specifically, evidence on BEREJANO GARCIA's phones shows that, on February 4, 2025, "Linda" placed a voice telephone call to BEJARANO GARCIA on BEJARANO GARCIA's phone assigned 559-462-9710 (9710) (the purple iPhone found in the bucket of rice in the residence, or the "9710 Phone").

18. The next day, on February 5, 2025, BEJARANO GARCIA took a screen shot of an Aldi grocery store located at 615 North Avenue, Jonesboro, Georgia 30236 with the 9710 Phone. The original photograph of the Aldi grocery store appears to have been accessed via the "Street View" feature of a publicly available mapping service such as Google Maps.

19. The following day, on February 6, 2025, between 1:56 p.m., and 9:18 p.m., BEJARANO GARCIA and "Linda" communicated by voice call approximately 15 times. For these communications with "Linda," BEJARANO GARCIA used a different phone: the phone assigned to 229-633-2783 (2783) (one of the three phones hidden in the HVAC vent of the residence, the "2783 Phone").

20. BEJARANO GARCIA again used the 2783 Phone to communicate with "Linda" via WhatsApp chat on the morning of February 7, 2025. (During these communications, "Linda" used a phone assigned to telephone number 404-781-7843). At 8:02 a.m., BEJARANO GARCIA sent "Linda" a photograph of a telephone number: "(470) 922-0193," as seen below:

8



21. This photograph was unusual because it appears to be a picture of a telephone number that was keyed into the telephone keypad of another cellphone.

22. Agents later determined that this telephone number was the phone number for Tory Hardesty.

23. In my experience investigating narcotics trafficking crimes, it is typical for narcotics traffickers to undertake various techniques to shield their illegal activity from detection. Sending a photograph of a telephone number typed but not used in the phone application, rather than sharing a phone contact or typing the number directly into, and sending, a message, is consistent with efforts to obscure the communication. Based on my training and experience, BEJARANO GARCIA sent "Linda" (a drug distributor) the telephone number for Hardesty (a drug customer) in this fashion in an attempt to avoid detection of their drug trafficking activity by law enforcement.

24. Later that day, on February 7, 2025, at approximately 5:15 p.m., a white Ford Transit van was stopped by the Atlanta Police Department. The van was operated by Tory Hardesty. A subsequent probable cause search of the van resulted in the seizure of 51 kilograms of methamphetamine, 5 kilograms of cocaine, 15 kilograms of marijuana and $73,500 in U.S. currency.

25. Law enforcement seized and searched Hardesty's phone after his arrest. Agents determined that Hardesty's phone number was 470-922-0193 (the same telephone number that BEJARANO GARCIA had forwarded to "Linda" earlier that morning). Additionally, agents determined that, almost immediately after "Linda"

received Hardesty's phone number from BEJARANO GARCIA, "Linda" began communicating with Hardesty.

26. Specifically, agents located a text message conversation between "Linda" (using the same 404-781-7843 phone number that "Linda" used to communicate with BEJARANO GARCIA) and Hardesty that started at 9:11 a.m., on February 7, 2025, prior to the drug seizure later that day.

27. In the first message, "Linda" had sent a screen shot to Hardesty of the Los Amigos Latin Bar & Grill located at 286 GA-138, Suite I-J, Riverdale, Georgia 30274.

28. In subsequent text messages, Hardesty told "Linda" that he was 50 minutes out and that when Hardesty arrived at the location he would send "Linda" a message. "Linda" then inquired, "Friend how long does it take you to get to that address?", and Hardesty responded "15." At approximately 10:11 a.m., Hardesty informed "Linda" that he had arrived. "Linda" then asked Hardesty, "Okay, I'll be there in 3 minutes the place is clean, right?" Based on my training and experience, the word "clean" in this context is referring to the presence of law enforcement in the area. Hardesty replied, "Looks like it." At approximately 10:21 a.m., "Linda" sent Hardesty a message, "Friend, come to this address there was a policeman when I arrived at that place" with a screen shot of the Aldi Grocery Store located at 615 North Ave. Jonesboro Georgia 30236. This appears to be the same as the screenshot on BEJARANO GARCIA's 9710 Phone that she had taken on February 5, 2025. Additionally, BEJARANO GARCIA used another one of her phones to take a picture of her 9710 Phone while it displayed that same screen shot of the Aldi grocery store.

11

29. At approximately 10:22 a.m., "Linda" contacted Hardesty and spoke on the phone for 29 seconds and again at 10:25 am. for 51 seconds. There were no additional communications between "Linda" and Hardesty prior to his arrest and drug seizure later that day.

30. To summarize, I believe there is probable cause to believe BEJARANO GARCIA aided and abetted Hardesty's and Linda's possession of controlled substances with intent to distribute on February 7, 2025. BEJARANO GARCIA's communications with "Linda" and Hardesty are consistent with BEJARANO GARCIA acting to coordinate a meeting in which the drug distributor ("Linda") supplied the drug customer (Hardesty) with drugs. BEJARANO GARCIA provided "Linda" with Hardesty's phone number only hours before "Linda" and Hardesty met. BEJARANO GARCIA shared Hardesty's phone number in a manner unlikely to be detected by law enforcement (*i.e.*, not in a text message or saved as a contact but as a picture of a telephone number). Hardesty's phone shows that "Linda" had not communicated with him prior to that time. Further, "Linda" and Hardesty's text exchanges show that they met for an illicit purpose and changed their meeting location out of their concern for the presence of police. Hardesty was stopped later that day with a large quantity of controlled substances in his van. Finally, based on my training and experience, my belief that BEJARANO GARCIA facilitated this drug transaction is corroborated by the exact same photograph of the Aldi grocery store that "Linda" sent to Hardesty to change the location of the drug deal being located on two of BEJARANO GARCIA's phones.

## CONCLUSION

31. Based upon the aforementioned facts, I assert there is probable cause to believe that on or about February 7, 2025, in the Northern District of Georgia and elsewhere, BEJARANO GARCIA knowingly aided and abetted Hardesty and "Linda", and others unknown, to possess with the intent to distribute a controlled substance, said substance involving at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a), (b)(1)(A), at least five kilograms or more of a mixture or substance containing a detectable amount of cocaine, in violation of Title 21, United States Code 841(a)(b)(1)(A), and at least one kilogram of marihuana, in violation of Title 21 United States Code 841(a)(b)(1)(C).

.

**END OF AFFIDAVIT**